BRONSTER FUJICHAKU ROBBINS
A Law Corporation

MARGERY S. BRONSTER      # 4750
REX FUJICHAKU               # 7198
MATTHEW J. TERRY           #10361
1003 Bishop Street, Suite 2300
Honolulu, Hawai'i 96813
Telephone:  (808) 524-5644
Facsimile:  (808) 599-1881
Email:    mbronster@bfrhawaii.com
          rfujichaku@bfrhawaii.com
          mterry@bfrhawaii.com

METHVIN, TERRELL, YANCEY,
STEPHENS & MILLER, P.C.
ROBERT G. METHVIN, JR. (admitted *pro hac vice*)
P. MICHAEL YANCEY  (admitted *pro hac vice*)
COURTNEY C. GIPSON  (admitted *pro hac vice*)
2201 Arlington Avenue South
Birmingham, Alabama 35205
Tel: (205) 939-0199
Email:    rgm@mtattorneys.com
          myancey@mtattorneys.com
          cgipson@mtattorneys.com

Attorneys for Plaintiff KATHY RYAN
INDIVIDUALLY AND IN HERCAPACITY
AS TRUSTEE OF THE BRODYFAMILY TRUST

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| KATHY RYAN, INDIVIDUALLY, AND IN HER CAPACITY AS TRUSTEE OF THE BRODY FAMILY TRUST, | Case 1:18-cv-00406-ACK-RT |
| | SECOND AMENDED COMPLAINT; EXHIBITS "A"  AND "B"; DEMAND FOR JURY TRIAL; CERTIFICATE OF SERVICE |
| Plaintiff, | |

vs.

CHRISTOPHER S. SALISBURY, C.
SALISBURY, LLC, CLARAPHI
ADVISORY NETWORK, LLC,
MICHAEL DIYANNI, AURORA
CAPITAL ALLIANCE, SECURITY
LIFE OF DENVER INSURANCE
COMPANY AND ALEJANDRO
ALBERTO BELLINI.

Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Kathy Ryan, by and through the undersigned counsel, individually

and as Trustee of The Brody Family Trust (collectively "Plaintiff" or "Ryan"),

states and alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to remedy Plaintiff's damages as a result of

Defendant Chris Salisbury's ("Salisbury") fraudulent and unlawful sales of annuity

and life insurance policies while employed by Defendants Claraphi Advisory

Network, LLC, and C. Salisbury, LLC.    Further, this action seeks damages

against all of the Defendants for their unfair, fraudulent and unlawful acts in

connection with providing Plaintiff with investment advice and/or products.  More

specifically, this action seeks damages against all of the Defendants for their

involvement in a premium financing arrangement for a VOYA life insurance

policy that greatly exceeded Plaintiff's financial needs.  The Defendants' actions

2

were motivated by increasing their own profits and commissions, rather than sound investment advice to Plaintiff.  As a result, Plaintiff has suffered substantial losses.

2.     Defendant Chris Salisbury served as Ryan's trusted financial advisor for over a decade, beginning in approximately 2004.  During that time, among a number of other investments, Salisbury marketed and sold to Plaintiff several annuities, which have high surrender charges, and engaged in a pattern of "churning" these annuities.  In other words, Salisbury directed Ryan to first purchase an annuity and then to later surrender it so that the same funds could be used to purchase yet another annuity.  With each surrender, Ryan incurred surrender charge penalties.  Salisbury falsely claimed that those losses were worthwhile and insignificant.  Meanwhile, Salisbury and his related entities received substantial commissions on these transactions while Ryan suffered considerable losses.

3.     In addition to the annuity churning, around early 2016, Salisbury advised Ryan to cancel her $1,000,000 Columbus Life Flexible Premium Universal Life Insurance Policy, which she had held for approximately ten years, and to replace it with a policy to be issued by VOYA Life Insurance Company because it was better suited to meet her needs. The VOYA policy had a face value of $2,500,000.  Salisbury advised Ryan that she needed the policy for estate planning purposes and that she personally would never have to pay a premium. Instead, the

3

policy would be purchased through a premium financing arrangement orchestrated by Salisbury and the other Defendants. As Ryan's trusted financial advisor, Salisbury knew that Ryan would never be able to afford the premium payments for the policy on her own.

4.      Salisbury worked with Defendant Alejandro Alberto Bellini who operated Aurora Capital Alliance to arrange for the cancellation of the Columbus Life policy, the sale of the VOYA policy and the financing of premiums to be paid to VOYA.  Together, they chose Lake Forest Bank & Trust Company ("Lake Forest") f/k/a First Insurance Funding Corporation ("First Insurance Funding") to provide the loan to cover the premiums and brokerage fee.  An Irrevocable Life Insurance Trust ("ILIT") was set up to serve as owner of the VOYA policy, and Bellini and Aurora Capital arranged for attorney Defendant Michael Diyanni to serve as Trustee.  Diyanni drafted and signed, as Trustee, the Trust Agreement of the Kathy Ryan Irrevocable Trust. Diyanni also signed documents required by VOYA for issuance of the VOYA policy.  Diyanni was paid an excessive $12,000 fee, a cost Plaintiff ultimately incurred.  As part of the premium financing arrangement, the VOYA policy was pledged as collateral. Salisbury, Bellini, Aurora Capital and Diyanni also directed Ryan to pledge her Allianz annuity as additional collateral for the loan. Salisbury assured her the premium financing arrangement would sufficiently cover the costs of the life insurance policy, she

would not have to pay any costs out of pocket, and her Allianz annuity would not

be at risk.   Ryan entered into the arrangement under the advice and counsel of

Salisbury, who led her to believe the arrangement was suitable and in her financial

best interests. Neither Salisbury, Bellini, Aurora Capital, nor Diyanni gave

sufficient warning or explanation concerning the risks the arrangement presented

to Ryan, and in particular the true degree of risk that the VOYA policy would be

lost (leaving her without life insurance that had been provided under the Columbus

Life policy the VOYA policy replaced), or that the Allianz annuity pledged as

collateral would also be lost.  Salisbury and the other Defendants withheld

documents and information from Ryan concerning the VOYA policy and the

premium financing arrangement. In fact, Ryan did not know Diyanni and was not

advised that he was trustee of the ILIT and owner of the VOYA policy until well

after issuance of the policy.

     5.     On the first anniversary of the VOYA policy, a letter was sent to

Diyanni advising him that the Note was in default because an interest payment of

$8,642.25 had not been made, the requisite additional collateral had not been

provided, and the $163,500 premium payment had not been made.  When Ryan

learned this information, she contacted VOYA who stated that it could only speak

with Diyanni.  Ryan also contacted Salisbury who at first told her there had been a

mistake, but later, informed her she had to immediately wire $37,000 to Lake

Forest or else the company would cancel the VOYA policy and cause the surrender of her Allianz annuity.  Ryan followed Salisbury's instructions in fear of incurring losses.  Salisbury also promised to refund Plaintiff's wire fees, but never did.

6.      Despite Plaintiff's payment of $37,000, Diyanni, Bellini and Salisbury failed to make arrangements for payment of the second year's premium and the lender for the premium finance arrangement Lake Forest Bank & Trust Company d/b/a Wintrust Life Finance, called for all amounts it had loaned to be repaid and to collect, it ultimately demanded full surrender of Plaintiff's VOYA policy.

7.      However, upon surrender of the VOYA policy, the cash value was insufficient to pay the loan.  Thus, Lake Forest also demanded full surrender of Plaintiff's Allianz annuity based on a collateral assignment purportedly signed by Plaintiff.  In response, Plaintiff disputed the validity of the collateral assignment, as well as the other documents executed in the course of the premium financing arrangement and issuance of the VOYA policy. In addition to complaining directly to Allianz, VOYA, Lake Forest and Salisbury, Plaintiff also made a formal complaint to the State of Hawaiʻi Insurance Division. That complaint was provided to VOYA.

8.      With Lake Forest demanding surrender of the Allianz annuity and Plaintiff disputing its right to do so, Allianz filed an interpleader action in the United States District Court District of Minnesota (Case No. 0:18-cv-0229).    In

6

response, Plaintiff continued to contest the surrender of the Allianz annuity and maintained that her participation in the premium financing arrangement, as well as her signature on any related documents were procured through fraud.  The interpleader action was ultimately dismissed with prejudice due to the stipulation and agreement of Lake Forest and Ryan.  Pursuant to that stipulation, Ryan reserved her rights and maintained her claims alleged in this action. As mitigation of damages to the Plaintiff, Allianz was also ordered to execute the surrender of the annuity and distribute in full to Lake Forest the surrender proceeds due and owing at that time pursuant to the terms of the annuity.

9.      Ryan, a 68-year-old retired woman, lost a substantial portion of her retirement funds and life insurance because she trusted Salisbury and the Defendants, who were recommended by Salisbury. The Defendants obfuscated the reality of these investments and financial arrangements and knowingly betrayed her trust.  In doing so, the Defendants reaped substantial monetary benefits from their acts to the extreme detriment of Ryan.

## PARTIES

10.     Plaintiff Kathy Ryan ("Ryan") is an individual domiciled in Lahaina, Hawaiʻi.  She brings her claims against the Defendants in both her individual capacity and as Trustee of The Brody Family Trust.

11.     Defendant Christopher S. Salisbury ("Chris Salisbury" and/or "Salisbury") is domiciled in Midland, Michigan.  While serving as an investment advisor and financial planner to the Plaintiff, Salisbury was an employee of Defendant Claraphi Advisory Network, LLC ("Claraphi"), and National Asset Management, Inc., among other entities.  Upon information and belief, he began working for Claraphi in approximately April 2013 and was discharged on April 1, 2019 for "failure to honor written agreement with the Firm."  *See* Investment Adviser Representative Public Disclosure Report, attached hereto as Exhibit "A". At relevant times, while transacting business as an investment advisor and financial planner to the Plaintiff, Salisbury operated under the direction and control of Defendants Claraphi and C. Salisbury, LLC.  Salisbury was at relevant times a registered Investment Adviser Representative with the Securities and Exchange Commission ("SEC"). His CRD# is 3106247. Salisbury is no longer registered as an Investment Adviser Representative.  Chris Salisbury and C. Salisbury, LLC are referred to collectively in this Complaint as the "Salisbury Defendants."  Salisbury also held himself out to the Plaintiff and acted as an agent for Security Life of Denver during the sale of Plaintiff's VOYA policy.[1]  In his capacity as an agent of Security Life of Denver, Salisbury acted with the apparent authority and under the

---

[1] Salisbury signed as an "agent" on VOYA's financing disclosure and acknowledgement form and was actively involved in the sale of the VOYA policy. *See* ECF 72-1 at p.1.

direction and control of Security Life of Denver who retained the right to control, direct, and/or manage his actions concerning the sale of the VOYA policy. Security Life of Denver knew from initial application of Salisbury's involvement in the sale of the VOYA policy, understood his position in the premium financing arrangement, and ratified his conduct in every respect.  Therefore, under the doctrines of ratification, vicarious liability and respondeat superior, Defendant Security Life of Denver is liable for the wrongful acts committed by those under its control, direction, or management as set forth herein.

      12.     Defendant C. Salisbury, LLC ("C. Salisbury, LLC") is a California domestic entity.  C. Salisbury, LLC has one manager and, upon information and belief only one member, which is Defendant Christopher Salisbury.  Defendant Salisbury is domiciled in Michigan.  Salisbury reported to the SEC that this entity "is my business entity that all compensation or commissions are paid direct to from Claraphi, and Accelerated Estate Planning." *See* Exhibit A.  C. Salisbury, LLC employed Defendant Salisbury during the LLC's existence from November 20, 2002 through December 31, 2018 and is liable for its own acts and the acts and omissions of Defendant Salisbury.

      13.     Upon information and belief, Defendant Michael Diyanni ("Diyanni") is an individual domiciled in California.  Diyanni and his law office, the Law Office of Michael Diyanni Esq., are the current Trustees for the Kathy Ryan

Irrevocable Trust.  Diyanni was hired by Aurora Capital Alliance on behalf of the Plaintiff to serve as Trustee and to draft the Kathy Ryan Irrevocable Trust and was paid a $12,000 fee as part of the premium financing arrangement.

14.     Defendant Claraphi Advisory Network, LLC ("Claraphi")[2] is registered with the SEC as a Registered Investment Advisor (IARD#165868) and markets itself as such.  Upon information and belief, Claraphi's only member is Claraphi Capital, LLC, which is a limited liability company organized and existing under the laws of the State of Washington.  Upon information and belief, the only members of Claraphi Capital, LLC are Nasr Vali and Mark Roth.  Upon information and belief, Nasr Vali's domicile is Laguna Hills, California, while Mark Roth's domicile is Lake Forest Park, Washington. Claraphi may be served at its main office location, 25401 Cabot Road, Suite 214, Laguna Hills, CA 92653. Defendant Claraphi employed Defendant Salisbury and was a controlling person of Salisbury, and is liable for its own acts and the acts and omissions of Defendant Salisbury.

15.     Defendant Bellini Holdings, Inc., d/b/a Aurora Capital Alliance ("Aurora Capital") is a "domestic stock" entity with its principal place of business and place of incorporation in California.  Aurora Capital hired Diyanni to serve as

---

[2] Pursuant to an order of this Court, the Plaintiff and Claraphi were ordered to proceed to arbitration on the issue of whether the claims against Claraphi are subject to an arbitration agreement. [ECF 145].  Pending that determination the instant case, as well as Claraphi's pending motion to dismiss, are stayed. *Id.*

Trustee and to draft the Kathy Ryan Irrevocable Trust and arranged for First Insurance Funding (now Lake Forest) to finance the VOYA premiums.  Defendant Aurora Capital also employed Defendant Alejandro Alberto Bellini and was responsible for supervising his activities. Defendant Aurora Capital is liable for its own acts and the acts and omissions of Defendant Alejandro Alberto Bellini and Diyanni.

16.     Defendant Security Life of Denver Insurance Company ("Security Life of Denver") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business also in Colorado.  Security Life of Denver conducts business in Hawai'i.  Security Life of Denver underwrote and issued the VOYA IUL-Global Choice life insurance policy at issue herein. Defendant Security Life of Denver is liable for its own acts and the acts and omissions of its agents who it appointed and authorized to conduct business on its behalf (including specifically Alejandro Alberto Bellini) and all related persons who participated in the sale of the policy (including specifically Defendant Chris Salisbury).[3]  Security Life of Denver is referred to interchangeably as "VOYA" throughout this complaint.

---

[3] Defendant Security Life of Denver's liability for the acts and omissions of Defendant Salisbury is limited to those acts and omissions by Salisbury related to the VOYA policy and premium financing arrangement.  Plaintiff does not claim that Security Life of Denver is liable for Salisbury's conduct related to the annuity churning scheme.

17.    Defendant Alejandro Alberto Bellini ("Bellini") was the writing agent for Ryan's VOYA IUL-Global Choice life insurance policy and with Salisbury sold the policy to Ryan and arranged the premium financing for the policy. Upon information and belief, Bellini is employed by and is the founder and/or managing partner of Aurora Capital. Bellini is an individual domiciled in California and at relevant times held a license to sell life insurance. Security Life of Denver appointed him as its agent and authorized him to market and sell its life insurance products, including the VOYA policy sold to the Plaintiff. Bellini held himself out as an agent of Security Life of Denver at the time he sold Plaintiff the VOYA policy and arranged the premium financing and was paid a commission by Security Life of Denver for doing so. While an appointed writing agent for Security Life of Denver, Defendant Bellini was required by the company to "comply with all applicable state and federal laws, including but not limited to any replacement regulations"; to "read and abide by the Company's Business Guidelines and other Company policies and procedures…"; to "use only advertising and sales materials, including illustrations, that are approved by the Company prior to use"; to "comply with Company procedures, as stated in the Guidelines, prohibiting unfair competition and rebating…"; to "implement procedures providing that anyone involved in the sales presentation, solicitation or receipt of compensation pertaining to any [life insurance] Contract will act in accordance with applicable

12

laws and regulations…"; and to "implement procedures providing that Producer and each of his employees will only make a recommendation to purchase a [life insurance] Contract when there are reasonable grounds to believe that the product meets the needs of the purchaser."[4]  Security Life of Denver controlled the manner in which Bellini and those working with him, including Salisbury, marketed and sold VOYA policies. Thus, Bellini was responsible for all acts and omissions committed by Salisbury in the course of marketing and selling the VOYA policy and the premium financing. Security Life of Denver retained the right to terminate Bellini's appointment, and also required Bellini to maintain errors and omission insurance. Bellini acted within the scope of, and in the course of his employment with, or under the direction and control of Security Life of Denver and Security Life of Denver paid him substantial commissions for the sale of the VOYA policy to Plaintiff. He, in turn, shared those commissions or otherwise compensated Salisbury for his participation in the sale of the VOYA policy and premium financing arrangement.  Security Life of Denver knew of, authorized and ratified Bellini's actions as a life insurance sales agent, including selling the VOYA policy with the premium financing arrangement.  While employed by Aurora Capital, Defendant Bellini also acted within the scope of, and in the course of his

---

[4] VOYA Financial's "Life Companies Producer Agreement" required of all appointed life insurance agents who marketed or sold Security Life of Denver Insurance Company products.

employment with, or under the direction and control of Aurora Capital who retained the right to control, direct, and manage.  Aurora Capital knew of and authorized Bellini's position to engage in the premium finance arrangement, including while also serving as the writing agent of the underlying VOYA policy. Therefore, under the doctrines of vicarious liability and respondeat superior, Defendants Security Life of Denver and Aurora Capital are liable for the wrongful acts committed while Bellini was under their control, direction, or management as set forth herein.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists among the parties and the amount in controversy exceeds $75,000, and all other factual conditions precedent necessary to empower this Court with subject matter and personal jurisdiction have been satisfied.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction in this district, and a substantial portion of Defendants' conduct that forms the basis of this action occurred and continues to occur in Hawai'i, including within the boundaries of this district.

## FACTUAL ALLEGATIONS

20.     The Brody Family Trust was created on February 9, 1993 with Kathy Brody (Plaintiff, whose name is now "Kathy Ryan") serving as the Trustee.  It was organized under the laws of California.  Ryan is referred to herein, and has suffered damages, both in her individual capacity and as Trustee of The Brody Family Trust.

21.     After Plaintiff's first husband passed away in 2002, the estate planning company which established The Brody Family Trust referred Ryan to Defendant Salisbury for her investment and financial planning needs.

### THE ANNUITY CHURNING SCHEME

22.     Early on as Ryan's financial advisor, Salisbury began investing Ryan's money and/or that of The Brody Family Trust into annuities, among other investments.

23.     The Salisbury Defendants engaged in "churning" or "twisting" of these annuities by having Ryan surrender certain annuities and move the money to different annuities with the promise that any surrender fees would be offset by either bonus monies or greater earnings of the new product.

24.     Annuities, such as those sold by the Salisbury Defendants should only be sold to consumers when they are "suitable" for the consumer's financial needs, situation, and goals.

25.     Key considerations for determining whether an annuity is suitable for a client are the client's liquidity needs, the length of time they intend to hold the contract, the client's risk tolerance, and whether the product fits in the client's overall objectives, as well as consideration of other products held by the client.

26.     In his capacity as Ryan's financial and investment advisor, Salisbury understood that Ryan did not have sophisticated knowledge of investment, financial, and insurance related matters.

27.     The Salisbury Defendants took advantage of the trust Ryan placed in Salisbury, as well as Ryan's limited knowledge, by making verbal representations without providing supporting documentation about the products Salisbury was directing Ryan to invest in or purchase. Salisbury routinely presented her with signature pages, rather than complete documents, which he instructed her to sign but not date.  Conveniently, Salisbury is also a licensed notary and often notarized documents that Ryan signed, including those signed outside of his presence.

28.     Key among the many annuities that Salisbury churned were certain Allianz annuities, at least two of which were surrendered at a high loss.

29.     First, on or about December 29, 2009, Ryan was caused to surrender Allianz Flexible Premium Deferred Annuity Policy with an Index Benefit bearing policy number XXX 3635 and a policy date of September 1, 2006.  It is estimated

that Ryan surrendered this annuity at an approximate $200,077.00 loss.  At the time of surrender, the annuity was valued at approximately $902,000.00.

30.     Second, on or about November 21, 2014, following the advice and direction of Salisbury, Ryan was caused to surrender Allianz Annuity #XXX 7754. This annuity was issued on December 18, 2006.

31.     Other examples of Ryan following the trusted advice and direction of Salisbury include several Phoenix Personal Income Annuities.

a.     On December 9, 2014, Phoenix Personal Income Annuity #XXX 5109 was issued with a single premium of $24,795.55.  That annuity was surrendered on or about October 19, 2017 with approximately $3,790.04 in surrender charges;

b.     A few days later, on December 11, 2014, Phoenix Personal Income Annuity #XXX 5355 was issued with a single premium of $24,800.42, which was surrendered on or about October 19, 2017, incurring approximately $3,936.86 in surrender charges;

c.     A few days after these two annuities were issued, Phoenix Personal Income Annuity #XXX 4609 was issued on December 18, 2014 with a single premium of $160,319.48.  It was surrendered on or about November 8, 2017 incurring approximately $25,983.85 in surrender charges; and

d.     Finally, on May 4, 2015, Phoenix Personal Income Annuity #XXX 8769 was issued with a single premium of $700,000 and was surrendered on or

17

about November 7, 2017, incurring approximately $110,220.74 in surrender charges.

Thus, Salisbury's churning scheme cost Ryan approximately $143,931.49 as to these four Phoenix Personal Income Annuities.

32.    Another example of Ryan following the trusted advice and direction of Salisbury is her purchase and investment in the Fidelity Premium Deferred Fixed Index Annuity, AdvanceMark Ultra 14, #XXX 5051 which was issued on February 8, 2015.  This annuity was surrendered in or around October 2017.  As of the most recent annual statement, it had an account value of approximately $453,282.53.  The surrender charge was $52,382.80.

33.    Yet another example is the American National annuity #XXX 0431 issued on March 14, 2014 with an initial premium payment of $737,450.85. Salisbury allowed that annuity to run just over a year before he had Ryan surrender it in or around April 2015, incurring approximately $61,028 in surrender charges.

34.    Ryan was also issued a ForeThought Single Premium Deferred Annuity Contract #XXX 8001, on February 11, 2009, with an initial premium of $166,949.80.  Ryan made several withdrawals from this annuity while it was in force at Salisbury's direction.  At the time of surrender on or about November 17, 2014, the annuity was valued at $146,486.39.  Ryan incurred a surrender fee of $7,324.32.

35.     Finally, on November 26, 2007, Ryan was issued a North American Company Individual Flexible Premium Deferred Annuity #XXX 2105 with an initial premium of $276,745.13.  Ryan paid an additional premium of $598,595.71 on or about April 27, 2012.  The annuity was surrendered for $737,450.85 on or about January 29, 2014.  The gross amount at the time of surrender was $825,656.79.  Ryan incurred a surrender charge of $111,463.67 with an interest adjustment of $23,257.73; in other words, Ryan suffered a net loss of $88,205.94.

36.     The annuity transactions mentioned above in Paragraphs 28–35 are not intended to serve as an exhaustive list of every annuity or investment that Salisbury churned to Ryan's detriment.  Yet, these annuities alone cost Ryan approximately $576,207.28 in surrender charges which would not have occurred but for Salisbury's wrongful acts.  Salisbury's conduct of churning annuities owned by Ryan and/or The Brody Family Trust was ongoing during his relationship as Ryan's financial and investment advisor.

37.     Over the course of all the annuity transactions, and with respect to each, Salisbury told Ryan that the surrender of the annuity was in her best interest and explained that any surrender charge incurred was worth incurring to better position the funds in the replacement annuity.

38.     The Salisbury Defendants fraudulently concealed that the annuity transactions were not in her best interest, that they were receiving substantial

19

commissions from churning Ryan's annuities, that churning annuities bore

substantial risk, that Ryan was a victim of a churning scheme, or that there was a

conflict of interest between the Salisbury Defendants and Ryan.  Ryan did not

know these facts and could not have discovered through the exercise of due

diligence that the Salisbury Defendants were wrongfully churning her annuities to

her detriment.  Not only did the Salisbury Defendants conceal material facts, but

they also misrepresented that that the high surrender charges associated with

Plaintiff's surrendered annuities would be offset by the newer annuities.  Plaintiff

was never aware that she was the victim of a churning scheme until consultation

with her attorneys in 2018 regarding the premium financing arrangement at issue

in this Second Amended Complaint.

39.    The financial planning and investment advice provided by Salisbury

in connection with the annuities and other investments was fraudulent, in violation

of the Hawaiʻi Unfair and Deceptive Acts or Practices Act, in violation of the

Hawaiʻi Securities Act, and constituted a breach of his fiduciary duties.

40.    C. Salisbury, LLC and Claraphi authorized Salisbury's actions and are

liable for those actions under the doctrines of respondeat superior and vicarious

liability.  C. Salisbury, LLC and Claraphi also have liability for failing to supervise

Salisbury and are further liable in their own right as set out herein.

20

## THE INSURANCE POLICIES

41.     At the advice of Salisbury, Ryan was issued a $1,000,000 Flexible

Premium Universal Life Insurance Policy from Columbus Life Insurance

Company.  The policy had an effective date of May 20, 2004.  Planned premiums

were $16,881.12 annually.

42.     Shortly thereafter, on October 6, 2004, Ryan was also issued a

Lincoln Benefit Flexible Premium Variable Life Insurance Policy at the advice of

Salisbury.  This policy carried a death benefit of $5,066,782.  The planned annual

payment was $279,731.  In or around 2008, Salisbury reduced the death benefit to

$500,000, and the policy was surrendered on October 7, 2013.

43.     In early 2016, Salisbury and Bellini began the process of marketing

and selling the VOYA policy to Plaintiff. In or around April 2016 the Columbus

policy was cancelled and replaced by the $2,500,000 VOYA IUL-Global Choice

Policy issued by Defendant Security Life of Denver with Defendant Bellini as the

writing agent, and subject to a complex financing arrangement concocted and

carried out by Defendants Salisbury, Bellini, Aurora Capital, Claraphi, and

Diyanni.

44.     The VOYA policy was sold to Ryan as a product that would fund

itself.  As such, Ryan was advised by Salisbury and Bellini that she would never

need to personally make premium payments on the policy by virtue of the design

of the premium financing arrangement Salisbury, Bellini, Aurora Capital, Diyanni, and Claraphi, had orchestrated.

45.     Like annuities, high dollar or "large case" life insurance policies should only be sold to consumers when they are "suitable" for the consumer's financial needs, situation, and goals. Moreover, premium financing arrangements for such policies should also be used only when suitable, and in particular, only when the insured can afford to pay the premiums without financing them. Indeed, Security Life of Denver's own requirement of its sales agents was that they only make a recommendation to purchase a life insurance contract when there are reasonable grounds to believe that the product meets the needs of the purchaser.

46.     Ryan expressed concerns about the value of the policy to Salisbury. Salisbury informed her that the policy was designed to assist her children in paying taxes after she died.  Salisbury did not inform her, however, at the time the VOYA policy was purchased that very little, if any, of her net worth would be subject to estate taxes.

47.     Upon information and belief, Salisbury and Bellini misrepresented Ryan's net worth on the application for the VOYA policy.  Also, while Salisbury and Bellini disclosed Ms. Ryan's Columbus Life policy in response to the question of whether she currently had "life insurance inforce or applied for," they checked "no" in the box next to the question of whether she was "considering discontinuing

making premium payments, surrendering, forfeiting, assigning to the insurer, or otherwise terminating" her existing Columbus Life policy.  *See* ECF 162-3 at pp. 5, 14.  This was clearly incorrect as the Columbus Life policy was cancelled the same month that the VOYA policy was dated, as was Salisbury's and Bellini's intention.  They also checked no to all of the following:

**PART I - P. REPLACEMENT VERIFICATION** *(For Agent use ONLY)*

1. To the best of your knowledge and belief, will any existing life or annuity coverage be replaced, lapsed, surrendered, or borrowed against? (If "Yes", submit state required replacement forms.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

a. Is the applicant considering discontinuing making premium payments, surrendering, forfeiting, assigning to the insurer or otherwise terminating their existing policy or contract? (If "Yes", complete state required replacement form and provide details below.) . . . . ☐ Yes ☐ No

b. Is the applicant considering using funds from their existing policies or contracts to pay premiums due on the new policy or contract? (If "Yes", complete state required replacement form.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

Company _____ Policy Number _____ Amount $ _____

*See* ECF 162-3 at pp. 6, 15.  Instead of selecting yes to any of the boxes related to replacement, Salisbury and Bellini had Plaintiff amend her application on or around May 20, 2016 to state that she did not have life insurance inforce or applied for.  *See* ECF 162-3 at p. 9.

48.    The VOYA policy was not in Ryan's best interests, did not meet her needs, and was not suitable for Ryan and neither was the premium financing arrangement.  Ryan did not need the life insurance and, even if she did, she lacked the liquid assets to properly fund the policy. The Salisbury Defendants, Bellini, Aurora Capital, Diyanni, and Claraphi, knew this but induced Ryan to enter into both transactions knowing it would be to her detriment and their financial gain.

23

49.     As a part of this scheme, a trust agreement was created on March 26, 2016 by a lawyer chosen by Salisbury and Bellini that Ryan had never met, Michael Diyanni.  Upon information and belief, Diyanni handles some tax matters but specializes primarily in personal injury and DUI/DWI cases.

50.     According to a disclosure from his law office, Diyanni was also hired by Defendant Aurora Capital Alliance to draft "an Irrevocable Trust that would meet both the standards for the financial institution and life insurance carrier."  In addition to drafting the trust, Diyanni and The Law Office of Michael Diyanni would also serve as the Trustee of the Kathy Ryan Irrevocable Trust.  Plaintiff did not know Diyanni and did not understand that he was Trustee of the ILIT and had ultimate control of the management and decisions for the VOYA policy.  Diyanni failed to properly advise Plaintiff as to the legal implications of the ILIT, the replacement of the Columbus Life policy with the VOYA policy, and the premium financing arrangement.

51.     After multiple application submissions by Salisbury and Bellini, and after Security Life of Denver conducted its underwriting of the policy, the VOYA IUL-Global Choice Policy, dated April 5, 2016, was issued by Defendant Security Life of Denver.  The annual scheduled premium, determined by Salisbury, Bellini and Security Life of Denver, was $160,000, which was well over the minimum monthly cost of insurance of $3,072.22 necessary for maintaining the policy, and

24

substantially more than the premium Plaintiff had paid for the Columbus Life

policy. The VOYA policy's death benefit of $2,500,000 was also substantially

more than Plaintiff needed.

52.     On April 12, 2016, First Insurance Funding (now Lake Forest) issued

its proposal of a $172,000 initial loan amount.  That amount included the $12,000

fee that was paid to Diyanni.  The $12,000 fee is substantially in excess of the

commissions normally paid for similar services.

53.     Thereafter, Diyanni assigned the VOYA policy as collateral to First

Insurance Funding (now Lake Forest). The assignment of the VOYA policy was

not in the Plaintiff's best interests, or the best interests of the beneficiaries of the

ILIT,

54.     Ryan was also required by Salisbury and Bellini to assign her Allianz

Annual Fixed Index Annuity #XXX 9437 as additional collateral.  Ryan was told

by Salisbury that the assignment would be released after seven years.  That annuity

has since been surrendered after being the subject of an Interpleader action in the

United States District Court District of Minnesota (Case No. 0:18-cv-0229) with

the surrender proceeds going to Lake Forest.

55.     However, the assignment was fraudulently procured by Salisbury,

Bellini and Diyanni as it is dated and notarized in Orange County, California when

Ryan was not on the U.S. Mainland and could not have signed the document.

56.     During and after the sale of the policy, as Trustee of the ILIT, Diyanni failed to perform his fiduciary duties to determine the appropriateness of replacing the Columbus Life policy or the suitability of the life insurance policy.  Further, Diyanni did not properly assess the negative consequences of the premium financing arrangement, the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement.  In short, the VOYA policy should have never been sold and issued.

57.     Likewise, during and after the sale of the policy, Bellini and Salisbury failed to perform their duties to determine the appropriateness of replacing the Columbus Life policy, and also failed to determine that the VOYA policy did not meet Plaintiff's needs.  Further, Bellini and Salisbury did not properly assess the negative consequences of the premium financing arrangement, the selection and assignment of collateral, and the funding of premiums outside of the premium financing arrangement.  In short, the VOYA policy should have never been sold and issued.

58.     A year later, Diyanni and Ryan were advised that the Note issued by First Insurance Funding (now Lake Forest) was in default for failure to make the interest payment of $8,642.25, and to make the premium payment of $163,500, as well as to provide the requisite collateral.

26

59.     In response, Ryan contacted both VOYA and Salisbury.  A VOYA representative stated the company could only speak with Diyanni as he was the "Owner" of the policy.  When Ryan spoke to Salisbury, he told her First Insurance Funding was mistaken, but later reversed course and instructed Ryan to wire $37,000 to First Insurance Funding and Lake Forest in order to secure the loan. Ryan wired this money but never received a receipt for her transaction.  Salisbury also promised to refund Plaintiff's wire fees, which were approximately $120 as a result of the time-sensitive nature of the transaction.  Salisbury did not refund Plaintiff's wire fees.

60.     In September 2017, after having gotten no help from Salisbury and Bellini, Ryan filed a complaint with the Insurance Division of the State of Hawai'i. In it, she asked that the policy be rescinded and her money returned to her. She noted that the VOYA policy was sold under false pretenses. She also noted that she was only provided copies of the VOYA policy and statements in August 2017, despite having requested them on multiple occasions. Salisbury and Bellini had withheld the documents, and much of the information concerning their scheme, in part by having Ryan execute only signature pages of documents.

61.     Ryan's complaint to the Insurance Division of the State of Hawai'i was provided to Security Life of Denver in October 2017. Security Life of Denver responded and acknowledged that the original application for the VOYA policy

was submitted by both Salisbury and Bellini, and that although Salisbury

ultimately did not become appointed, Bellini was an appointed agent and was the

"writing agent" under the policy. Security Life of Denver did not respond to

Ryan's allegations that the policy had been sold under false pretenses, and did not

honor her request to refund her money. Either Security Life of Denver knew that

Ryan's allegations were true and chose to ignore the fact it had accepted $160,000

in premium for a $2,500,000 policy it knew should have never been issued, or it

failed to investigate Ryan's allegations at all, or did so inadequately without

contacting Ryan. At a minimum, had Security Life of Denver done an adequate

investigation, it would have learned the truth of Ryan's allegations and would have

determined that the policy had been procured through fraud and was due to be

rescinded and premiums refunded.

62.    Despite being told by Salisbury that Ryan would never have to

personally pay premiums on the VOYA policy and that the policy would fund

itself, she was also advised by Defendant Aurora Capital in or around March 2018

that the action items on her life insurance premium finance arrangement included

an outstanding interest payment of $24,545.82 and a signed, dated Guarantors

Acknowledgment and Certification Additional Collateral of $60,639.55.

63.    Thereafter, on or around May 1, 2018, Wintrust demanded surrender

of the VOYA policy.

64.     On or around May 5, 2018, after having been informed by Ryan that the VOYA policy had been sold to her as part of a scam, Security Life of Denver surrendered the VOYA policy and paid $42,822.64 to Wintrust as the surrender value of the policy.  In turn, Security Life of Denver pocketed $42,025 as a surrender charge and any additional monies being held in reserve for the policy were released and became additional profit for the company.

65.     After receiving the benefit of the surrender charge and the premiums paid on the VOYA policy, Security Life of Denver made no effort to notify Plaintiff of the surrender despite knowing that Plaintiff was a payor on the VOYA policy and that she had complained to the Hawaiʻi Insurance Division that her VOYA policy was issued under false pretenses.  Instead, Security Life of Denver attempted only to notify the Kathy Ryan Irrevocable Trust (i.e., Diyanni), but those letters were returned to sender.

66.     Upon surrender of the VOYA policy, the cash value was insufficient to pay the premium finance loan.  Thus, Lake Forest/Wintrust also demanded full surrender of Plaintiff's Allianz annuity based on a collateral assignment purportedly signed by Plaintiff.  Although she had already provided notice to Security Life of Denver through her complaint to the State of Hawaiʻi Insurance Division, she again disputed the validity of the collateral assignment, as well as the

29

other documents executed in the course of the premium financing arrangement and issuance of the VOYA policy.

67.    With Lake Forest/Wintrust demanding surrender of the Allianz annuity and Plaintiff disputing its right to do so, Allianz filed an interpleader action in the United States District Court District of Minnesota (Case No. 0:18-cv-0229). In response, Plaintiff continued to contest the surrender of the Allianz annuity and maintained that her participation in the premium financing arrangement, as well as her signature on any related documents were procured through fraud.  The interpleader action was ultimately dismissed with prejudice due to the stipulation and agreement of Lake Forest and Ryan.  Pursuant to that stipulation, Ryan reserved her rights and maintained her claims alleged in this action. As mitigation of damages to the Plaintiff, Allianz was also ordered to execute the surrender of the annuity and distribute in full to Lake Forest the surrender proceeds due and owing at that time pursuant to the terms of the annuity. Had Security Life of Denver performed adequate due diligence through underwriting, the VOYA policy would have never been issued. Or, had it properly investigated Ryan's allegations that the policy had been procured through fraud in October 2017, it would have determined that the policy was due to be rescinded and the premiums refunded. Had it done so, Lake Forest/Wintrust would have received its money back and Plaintiff's Allianz annuity would not have been surrendered.

68.     Ryan was also harmed by the wrongful replacement of her Columbus Life policy and the purchase of the VOYA policy and the premium financing arrangement (as well as the numerous other investments that the Salisbury Defendants placed her in) because it was an unsuitable financial product in light of the excessive death benefit and premiums exceeding her ability to pay, which was known to Defendants at the time they initiated and approved the transaction.

69.     The sale of the policy and premium financing arrangement were part of a fraudulent and deceptive scheme carried out by the Defendants working in concert with one another.  Their acts were in violation of the Hawaiʻi Unfair and Deceptive Trade Practices Act, the California Business and Professions Code, and the California Elder Abuse Act.  The Salisbury Defendants, Security Life of Denver, Bellini, Diyanni, and Aurora Capital were also unjustly enriched through their involvement in the premium financing arrangement and sale of the VOYA policy.  Among other allegations set out herein, the Salisbury Defendants, Claraphi, and Diyanni's actions were also fraudulent, in breach of their fiduciary duties, and, as to the Salisbury Defendants and Claraphi, constituted a violation of the Hawaiʻi Securities Act.

## FIRST CAUSE OF ACTION

**(Violation of the Unfair and Deceptive Acts or Trade Practices Act, Haw. Rev. Stat. §§ 480-1, *et. seq.* as to all Defendants)**

70.     Ryan adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

71.     By reason of the conduct and scheme described herein, Defendants have engaged in deceptive and unfair acts and practices within the meaning of Haw. Rev. Stat. §§ 480-1, *et. seq.* and were directed toward, targeted, and/or injured the elderly Plaintiff with respect to all transactions taking place on or after her 62nd birthday in 2012.

72.     The actions of Defendants constitute willful, malicious and egregious violations of Haw. Rev. Stat. § 480-2, which provides in relevant part: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

73.     The Salisbury Defendants and Claraphi engaged in unfair and deceptive acts and practices by the use and employment of deception, fraud, false pretenses, misrepresentation, concealment, suppression, and omission of material facts.  Specifically, while employed by Claraphi, Defendant Salisbury falsely represented the value of churning Ryan's annuities when, or around the time, that those annuities were surrendered as set out in Paragraphs 28–35. While employed by Claraphi, Salisbury also falsely represented that establishing the ILIT, purchase

32

of the VOYA policy, and the premium financing arrangement was in Ryan's best interest.

74. While an agent of Security Life of Denver, Salisbury advised Plaintiff to cancel her $1,000,000 Columbus Life policy and replace it with the VOYA policy, which he misrepresented was necessary for Plaintiff's estate planning purposes. Salisbury made this misrepresentation in an effort to sell the VOYA policy.

75. In his capacity as Ryan's investment advisor and financial planner and, with respect to the VOYA policy, as an agent for Security Life of Denver, Defendant Salisbury concealed substantial information from Ryan by sending her only signature pages, withholding documents, and providing little to no information about the transactions that he performed on Ryan's behalf, all while maintaining Ryan's trust.

76. The Salisbury Defendants and Claraphi deceived Ryan into purchasing various annuities and surrendering said annuities at high surrender charges by failing to provide Ryan with full disclosures or documentation related to the annuities and falsely representing that surrender of the annuities was in Ryan's best interest, i.e. claiming that the annuities were being surrendered for a better product and that the surrender charges would be offset by the new annuity.

77. The Salisbury Defendants committed acts of unfair and deceptive trade practices by recommending to Plaintiff annuity products that were unsuitable in violation of Haw. Rev. Stat. § 431:10D-623.

78. The Salisbury Defendants and Claraphi failed to provide reasonably adequate information about the conflicts of interest that existed among each of them and Ryan, the actual costs associated with the annuities described herein, or the VOYA policy, and failed to provide information about the inherent risks and minimal benefits of the annuities described herein or the VOYA policy.

79. Ryan was considered an "Elder" within the meaning of Haw. Rev. Stat. § 480-13.5[5] at the time that Defendant Salisbury surrendered several of her annuities, including but not limited to:

a. Allianz Flexible Premium Deferred Annuity Policy with an Index Benefit, #XXX 3635, surrendered on or about December 29, 2009;

b. North American Company Individual Flexible Premium Deferred Annuity ##XXX 2105 surrendered on or about January 29, 2014;

c. ForeThought Single Premium Deferred Annuity Contract # XXX 8001 surrendered on or about November 17, 2014;

d. Allianz Annuity #XXX 7754 surrendered on or about November 21, 2014;

---

[5] Section 480-13.5 provides that "'elder' means a consumer who is sixty-two years of age or older." *See* Haw. Rev. Stat. § 480-13.5.

e.      American National Annuity #XXX 0431 surrendered in or around April 2015;

f.      Fidelity Premium Deferred Fixed Index Annuity, AdvanceMark Ultra 14 #XXX 5051, surrendered in or around October 2017;

g.      Phoenix Personal Income Annuity #XXX 5109 surrendered on or about October 19, 2017;

h.      Phoenix Personal Income Annuity #XXX 5355 surrendered on or about October 19, 2017;

i.      Phoenix Personal Income Annuity #XXX 8769 surrendered on or about November 7, 2017; and

j.      Phoenix Personal Income Annuity #XXX 4609 surrendered on or about November 8, 2017.

80.     The Salisbury Defendants acted in willful disregard of Ryan's rights. Because of his special relationship to Ryan, Salisbury knew that Ryan had limited knowledge of the financial industry and had limited understanding of the transactions that Salisbury brokered on her behalf.  Despite this knowledge and knowing that his acts were directed towards an elder, Salisbury willfully took advantage of Ryan by buying and selling annuities on Ryan's behalf that caused her to incur substantial surrender charges as set out in Paragraphs 28–35.

81.     Although holding himself out as an agent with the apparent authority to transact business on behalf of Security Life of Denver from approximately February 2016 through April 2016, Defendant Salisbury concealed the fact that he was not formally appointed to do so and instead was attempting to obtain appointment as a writing agent for Security Life of Denver. He also concealed the fact that his attempts to become appointed failed. He also failed to disclose that his purpose of his efforts were to receive commissions directly from Security Life of Denver for the sale of the VOYA policy; and thus, he concealed that his efforts in securing and obtaining the VOYA policy, and replacing the Columbus Life policy, were motivated by self-interest to benefit himself and the interests of Security Life of Denver.

82.     When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni, as Trustee of the ILIT, concealed the fact that he had failed to perform his fiduciary duties to make a determination of the appropriateness of replacing the Columbus Life policy, or the premium financing arrangement, or the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement. When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni also concealed the fact that he

was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan.

83.     When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Bellini concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan as, upon information and belief, he was employed by Aurora Capital and stood to benefit from the transaction at Ryan's expense.  In his capacity as the managing partner of Aurora Capital, Defendant Bellini also failed to disclose to Plaintiff that she would be required to pay interest annually on the premium finance loan.  It was Plaintiff's understanding based on representations and omissions made by Bellini and Salisbury that she would not have to make payments on the VOYA policy and premium finance arrangement because the policy would fund itself.

84.     In his capacity as a writing agent for Security Life of Denver, Bellini also knowingly sold the unsuitable and unneeded VOYA life insurance policy to Ryan and improperly replaced her existing policy, which was more appropriate for her financial needs.  Moreover, Bellini was required to deliver the VOYA policy to Plaintiff as Security Life of Denver instructed him to deliver the policy and related materials to Ryan immediately.  While Bellini may have delivered the policy to Diyanni, he did not deliver the policy to Plaintiff despite knowing that she was a

payor on the policy and ultimately responsible for maintaining the loan that would fund the VOYA policy.   In other words, Bellini never provided a copy of the VOYA policy to Plaintiff despite knowing that her money was at stake in the transaction.  This is unusual considering that his company, Aurora Capital, contacted Plaintiff after issuance of policy when action items to maintain the policy were due on the premium finance arrangement.

85.     Similarly, despite being on notice that Plaintiff was a payor on the VOYA policy, as well as the insured, and that Plaintiff had complained that the VOYA policy was created through fraud, Security Life of Denver failed to notify Plaintiff when the VOYA policy was surrendered.  It failed to notify Plaintiff even after the notices to Diyanni were returned.

86.     Security Life of Denver had been notified on or around October 4, 2017 that Plaintiff submitted a complaint to the Hawaiʻi Insurance Division.  The Hawaiʻi Insurance Division mailed a letter to Security Life of Denver dated October 4, 2017, which attached Plaintiff's complaint.  In her complaint, Plaintiff sought to have the policy terminated, her annuity released back to her, and her $37,000 returned.  Plaintiff alleged that she was sold the VOYA policy under false pretenses.  Among other things, Plaintiff stated that she did not know what an ILIT was; that she never received any acknowledgement of changes to the VOYA policy or where her $37,000 went; that she was not able to obtain documents

38

related to the VOYA policy; and that she did not know who Diyanni was.  Despite

having all of this information – including notice that the VOYA policy was created

through fraud – Security Life of Denver failed to conduct an adequate investigation

of her allegations, failed to respond to Plaintiff's allegations and failed to rescind

the VOYA policy and return the premiums paid. Security Life of Denver did not

conduct an adequate investigation or rescind the policy because it knew that if the

policy was ultimately surrendered (rather than rescinded) the company would

profit from the surrender charges and release of reserves.

87.     Likewise, the Defendants engaged in unfair and deceptive acts and

practices by the use and employment of deception, fraud, false pretenses,

misrepresentation, concealment, suppression, and omission of material facts.

These acts and practices include, but are not limited to:

a.     Defendant Aurora Capital engaging Defendant Diyanni to draft and

serve as Trustee of the Kathy Ryan Irrevocable Trust at an excessive fee of

$12,000;[6]

b.     Defendants Security Life of Denver, Bellini, and Salisbury selling and

issuing Ryan's VOYA life insurance policy, dated April 5, 2016, with an excessive

---

[6] The Kathy Ryan Irrevocable Trust was signed on March 26, 2016 by Diyanni as
trustee and Kathy Ryan as grantor.  The loan proposal including the $12,000 fee,
which was provided by First Insurance Funding and signed by Michael Diyanni, is
dated April 12, 2016.

death benefit that did not correspond to her net worth, her financial needs, and which she could not afford;

      c.     Defendant Security Life of Denver failing to adequately investigate and take appropriate action, including failing to rescind the policy and refund the premiums, in response to Plaintiff's complaint to the Hawai'i Insurance Division wherein Plaintiff alleged that the policy was the result of fraud;

      d.     Defendant Salisbury and Bellini misrepresenting Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and failing to disclose that the VOYA policy was a replacement of the Columbus Life policy;

      e.     Defendant Security Life of Denver accepting and ratifying Salisbury and Bellini's misrepresentations of Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and their failure to disclose that the VOYA policy was a replacement of the Columbus Life policy after being provided sufficient notice that Plaintiff's signature on the application was procured through fraud;

      f.     Defendant Diyanni drafting an illusory trust designed for his own financial benefit and that of the other  Defendants dated March 26, 2016;

      g.     Defendant Diyanni charging an excessive fee as indicated on the loan proposal signed by Diyanni on April 12, 2016; and

h.     Defendants Diyanni and Salisbury requiring Ryan to sign an agreement purportedly releasing Diyanni from liability for the legal services he rendered with said agreement being undated but, upon information and belief, was signed around the time of other pertinent documents related to the premium financing arrangement, i.e. on or around March – April 2016.

88.    Defendants committed acts of unfair and deceptive trade practices by selling and arranging the financing of the unsuitable VOYA life insurance policy. The arrangement was inherently unfair or deceptive because it:

a.     contained hidden charges, changing terms, and undisclosed expenses and risks; and

b.     was unnecessarily complex in its terms to the point that no reasonable senior citizen could understand the risks and benefits of the product.

89.    The representations made by Defendants were designed to be deceptive in order to induce Ryan to enter financial transactions with Defendants as set out herein.

90.    The ultimate goal of the above conduct was to increase Defendants' profits at the expense of Ryan.

91.    Defendants' actions are in violation of HAW. REV. STAT. §§ 480-1, *et. seq.*

92.     Pursuant to HAW. REV. STAT. § 480-12, the VOYA policy and the contracts associated with the funding of the VOYA policy, including any and all funding agreements with Defendant Aurora Capital and the release agreement with Defendant Diyanni, should be voided as violating HAW. REV. STAT. CHAPTER 480.

93.     Moreover, at the time the ILIT was established and the VOYA IUL-Global Choice Insurance Policy was issued, Ryan was 65 years of age and considered an "Elder" within the meaning of HAW. REV. STAT. § 480-13.5. Defendants knew that Ryan was an elder; knew Ryan did not have the financial means to fund the life insurance policy on her own; and acted in willful disregard of Ryan's rights.

94.     In light of the foregoing, Ryan seeks treble or punitive damages, attorney's fees, and costs in accordance with HAW. REV. STAT. §§ 480-13 and/or 480-13.5 in addition to compensatory damages, restitution, and any such other further relief as this Court deems just and proper.

95.     Because Defendants' actions were directed toward an elderly Plaintiff, Ryan seeks the higher civil penalty afforded by HAW. REV. STAT. § 480-13.5 for Defendants' violations of § 480-2.

**SECOND CAUSE OF ACTION**
**(Violation of CAL. BUS. & PROF. § 17200, *et. seq.* as to all Defendants)**

96.     Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

42

97.     The VOYA policy contains a governing law provision stating that the law of the jurisdiction in which the policy is delivered shall apply, which is described as being the state in which the application is executed.  *See* ECF 128-2 at p. 9.  The application was executed and delivered to Diyanni in San Diego, California.  *See* ECF 162-3 at p. 8.  Security Life of Denver also identifies the state of issue for the policy as California.

98.     By reason of the conduct and scheme described herein, Defendants have engaged in unlawful, deceptive and unfair business practices within the meaning of California Business and Professions Code § 17200, *et. seq.*  Defendants' acts and practices offend an established public policy, and Defendants have engaged in immoral, unethical, oppressive and unscrupulous activities that are substantially injurious to consumers, including Plaintiff.

99.     The unlawful business practices perpetrated by the Defendants and their agents, employees, subsidiaries, and contractors include violations of CAL. CIV. CODE § 1572 (actual fraud), § 1573 (constructive fraud), § 1709 (deceit); CAL. INS. CODE §§ 330–32 (concealment), §§ 350–61 (representations), § 780 (misrepresentation of benefits or privileges promised under the terms of an insurance policy); CAL. INS. CODE §§ 790 (unfair practices), *et. seq.*, specifically §§ 790.02 & 790.03; CAL. INS. CODE §§ 10509.4, 10509.6, 10509.8 (related to

replacement of life insurance), and other portions of the California Insurance Code and related regulations and rules.  Such acts include, but are not limited to:

     a.      While employed by Claraphi, Salisbury falsely represented that establishment of the ILIT, purchase of the VOYA policy, and the premium financing arrangement was in Ryan's best interest;

     b.      While an agent of Security Life of Denver, Salisbury advised Plaintiff to cancel her $1,000,000 Columbus Life policy and replace it with the VOYA policy, which he misrepresented was necessary for Plaintiff's estate planning purposes in an effort to sell the policy;

     c.      Although holding himself out as an agent with the apparent authority to transact business on behalf of Security Life of Denver from approximately February 2016 through April 2016, Defendant Salisbury concealed the fact that he was not formally appointed to do so and instead was attempting to obtain appointment as a writing agent for Security Life of Denver. He also concealed the fact that his attempts to become appointed failed. He also failed to disclose that his purpose of his efforts were to receive commissions directly from Security Life of Denver for the sale of the VOYA policy; and thus, he concealed that his efforts in securing and obtaining the VOYA policy, and replacing the Columbus Life policy, were motivated by self-interest to benefit himself and the interests of Security Life of Denver;

d.      When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni also concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan;

e.      When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni, as Trustee of the ILIT, concealed the fact that he had failed to perform his fiduciary duties to make a determination of the appropriateness of replacing the Columbus Life policy, or the premium financing arrangement, or the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement;

f.      In his capacity as a writing agent for Security Life of Denver, Bellini knowingly sold the unsuitable and unneeded VOYA life insurance policy to Ryan and improperly replaced her existing policy, which was more appropriate for her financial needs; and

g.      When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Bellini concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan as, upon information and belief, he was employed by Aurora Capital and stood to benefit from the transaction at Ryan's expense.

100.   In addition, Security Life of Denver had been notified on or around October 4, 2017 that Plaintiff submitted a complaint to the Hawaiʻi Insurance Division.  The Hawaiʻi Insurance Division mailed a letter to Security Life of Denver dated October 4, 2017, which attached Plaintiff's complaint.  In her complaint, Plaintiff sought to have the policy terminated, her annuity released back to her, and her $37,000 returned.  Plaintiff alleged that she was sold the VOYA policy under false pretenses.  Among other things, Plaintiff stated that she did not know what an ILIT was; that she never received any acknowledgement of changes to the VOYA policy or where her $37,000 went; that she was not able to obtain documents related to the VOYA policy; and that she did not know who Diyanni was.  Despite having all of this information – including notice that the VOYA policy was created through fraud – Security Life of Denver failed to respond to Plaintiff's allegations and failed to rescind the VOYA policy and return the premiums paid. Security Life of Denver did not conduct an adequate investigation or rescind the policy because it knew that if the policy was ultimately surrendered (rather than rescinded) the company would profit from the surrender charges and release of reserves.

101.   Defendants treated Plaintiff unfairly.  For example, Security Life of Denver was on notice that Plaintiff was a payor on the VOYA policy, as well as the insured, and that Plaintiff had complained that the VOYA policy was created

46

through fraud.  Despite notice of Plaintiff's interest, Security Life of Denver failed to make any effort to notify her that the VOYA policy was surrendered.  It failed to notify Plaintiff even after the notices to Diyanni were returned as undelivered Moreover, upon the surrender, Security Life of Denver pocketed $42,025 as a surrender charge and any additional monies being held in reserve for the policy were released and became additional profit for the company

102.   Similarly, in his capacity as a writing agent for Security Life of Denver, Bellini was required to deliver the VOYA policy to Plaintiff by Security Life of Denver.  While Bellini may have delivered the policy to Diyanni, he did not deliver the policy to Plaintiff despite knowing that she was a payor on the policy and ultimately responsible for maintaining the loan that would fund the VOYA policy.  In other words, Bellini never provided a copy of the VOYA policy to Plaintiff despite knowing that her money was at stake in the transaction.  This is unusual considering that his company, Aurora Capital, subsequently contacted Plaintiff when action items were due on the premium finance arrangement.

103.   Defendants' actions, claims, nondisclosures and misleading statements, as alleged in this Second Amended Complaint, were both likely and intended to deceive Plaintiff and members of the public. Plaintiff has in fact been deceived and relied on Defendants' representations and omissions.  For example:

a.      In his capacity as Ryan's investment advisor and financial planner and, with respect to the VOYA policy, as an agent for Security Life of Denver, Salisbury concealed substantial information from Ryan by sending her only signature pages, withholding documents, and providing little to no information about the transactions that he performed on Ryan's behalf, all while maintaining Ryan's trust;

b.      The Salisbury Defendants and Claraphi failed to provide reasonably adequate information about the conflicts of interest that existed among each of them and Ryan, the actual costs associated with the VOYA policy, and failed to provide information about the inherent risks and minimal benefits of the VOYA policy; and

c.      In his capacity as the managing partner of Aurora Capital, Defendant Bellini failed to disclose to Plaintiff that she would be required to pay interest annually on the premium finance loan when Plaintiff understood that she would not have to make payments on the VOYA policy and premium finance arrangement.

104.   Plaintiff's reliance on Defendants' representations and omissions caused her harm.  Plaintiff suffered injury in fact, was disadvantaged and lost money as a result of Defendants' unlawful, unfair and deceptive practices.

105.    These, and the other Defendants, also engaged in unlawful, deceptive and unfair business practices by, but not limited to, the following:

a.    Defendant Aurora Capital engaging Defendant Diyanni to draft and serve as Trustee of the Kathy Ryan Irrevocable Trust at an excessive fee of $12,000;[7]

b.    Defendants Security Life of Denver, Bellini, and Salisbury selling and issuing Ryan's VOYA life insurance policy, dated April 5, 2016, with an excessive death benefit that did not correspond to her net worth, her financial needs, and which she could not afford;

c.    Defendant Security Life of Denver failing to adequately investigate and take appropriate action, including failing to rescind the policy and refund the premiums, in response to Plaintiff's complaint to the Hawaiʻi Insurance Division wherein Plaintiff alleged that the policy was the result of fraud;

d.    Defendant Salisbury and Bellini misrepresenting Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and failing to disclose that the VOYA policy was a replacement of the Columbus Life policy;

---

[7] The Kathy Ryan Irrevocable Trust was signed on March 26, 2016 by Diyanni as trustee and Kathy Ryan as grantor.  The loan proposal including the $12,000 fee, which was provided by First Insurance Funding and signed by Michael Diyanni, is dated April 12, 2016.

e.     Defendant Security Life of Denver accepting and ratifying Salisbury and Bellini's misrepresentations of Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and their failure to disclose that the VOYA policy was a replacement of the Columbus Life policy after being provided sufficient notice that Plaintiff's signature on the application was procured through fraud;

f.     Defendant Diyanni drafting an illusory trust designed for his own financial benefit and that of the other Defendants dated March 26, 2016;

g.     Defendant Diyanni charging an excessive fee as indicated on the loan proposal signed by Diyanni on April 12, 2016; and

h.     Defendants Diyanni and Salisbury requiring Ryan to sign an agreement purportedly releasing Diyanni from liability for the legal services he rendered with said agreement being undated but, upon information and belief, was signed around the time of other pertinent documents related to the premium financing arrangement, i.e. on or around March – April 2016.

106.   Defendants committed acts of unfair and deceptive trade practices by selling and arranging the financing of the unsuitable VOYA life insurance policy. The arrangement was inherently unfair or deceptive because it:

a.     contained hidden charges, changing terms, and undisclosed expenses and risks; and

50

b.      was unnecessarily complex in its terms to the point that no reasonable

senior citizen could understand the risks and benefits of the product.

107.   As a result of their unfairness and deception, Defendants have been

able to reap unjust revenue and profit.  Restitution is, therefore, appropriate and the

Plaintiff asks that this Court order restitution.

108.   Plaintiff is informed and believes and thereupon alleges that in

committing these acts, Defendants have acted intentionally, oppressively,

maliciously, fraudulently, unlawfully and unfairly with a conscious disregard of

the Plaintiff's rights, with the intent of benefiting themselves financially and with

the intent of causing, or recklessly disregarding the probability of causing, injury to

the Plaintiff. In so acting, Defendants intended to and did vex, annoy, injure,

oppress and harass the Plaintiff.

## THIRD CAUSE OF ACTION
### (Violation of California Elder Abuse Act to all Defendants)

109.   Plaintiff adopts, re-alleges and incorporates herein each and every

allegation in the preceding paragraphs, as though fully set forth herein.

110.   The VOYA policy contains a governing law provision stating that the

law of the jurisdiction in which the policy is delivered shall apply, which is

described as being the state in which the application is executed.  *See* ECF 128-2 at

p. 9.  The application was executed and delivered to Diyanni in San Diego,

California. *See* ECF 162-3 at p. 8. Security Life of Denver also identifies the state of issue for the policy as California.

111. At the time the ILIT was established and the VOYA IUL Global Choice Insurance Policy was issued, Plaintiff was 65 years of age and considered an "Elder" within the meaning of CAL. WELF. & INST. CODE § 15610.27.

112. Furthermore, Defendants and their agents, due to their relationship with Plaintiff, had a duty to refrain from misrepresenting the terms and benefits of the VOYA policy and premium financing arrangement. *See* CAL. INS. CODE §§ 330–32, 350–61.

113. Plaintiff is informed and believes and thereupon alleges that Defendants have committed "financial abuse of an elder" within the meaning of CAL. WELF. & INST. CODE § 15610.30(a)(1) by "tak[ing], secret[ing], appropriate[ing], obtain[ing], or retain[ing] real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both" or assisted in committing "financial abuse of an elder" within the meaning of CAL. WELF. & INST. CODE § 15610.30(a)(2) "for a wrongful use or with intent to defraud, or both."

114. Plaintiff is informed and believes and thereupon alleges that Defendants have committed "financial abuse of an elder" within the meaning of CAL. WELF. & INST. CODE § 15610.30(a)(3) by "tak[ing], secret[ing],

52

appropriate[ing], obtain[ing], or retain[ing], or assist[ing] in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70." Defendants took advantage of Plaintiff's age and lack of education or understanding of financial products. This is particularly true of Defendant Salisbury, when soliciting and executing the sale of the VOYA policy and premium financing arrangement, because he knew from working with Plaintiff for years that she lacked financial savviness. Defendants utilized certain tactics as set out herein, including failing to disclose material facts related to the VOYA policy and premium financing arrangement, in order to benefit themselves without regard for the detrimental effects to Plaintiff.

115.   CAL. WELF. AND INST. CODE § 15610.30(b) provides that "[a] person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." Plaintiff is informed and believes and thereupon alleges that pursuant to CAL. WELF. AND INST. CODE § 15610.30(b), Defendants Security Life of Denver, Bellini, and Salisbury breached their duties owed to Plaintiff by replacing her Columbus Life policy with the VOYA policy, and all of the

Defendants breached their duties owed to Plaintiff by engaging in the premium

financing arrangement.  Defendants entered these transactions knowing that they

would be to Plaintiff's detriment.

116.   Defendants' acts in violation of these provisions, include but are not

limited to, the following:

a.       While employed by Claraphi, Salisbury falsely represented that

establishment of the ILIT, purchase of the VOYA policy, and the premium

financing arrangement was in Ryan's best interest;

b.       While an agent of Security Life of Denver, Salisbury advised Plaintiff

to cancel her $1,000,000 Columbus Life policy and replace it with the VOYA

policy, which he misrepresented was necessary for Plaintiff's estate planning

purposes in an effort to sell the policy;

c.       Although holding himself out as an agent with the apparent authority

to transact business on behalf of Security Life of Denver from approximately

February 2016 through April 2016, Defendant Salisbury concealed the fact that he

was not formally appointed to do so and instead was attempting to obtain

appointment as a writing agent for Security Life of Denver.  He also concealed the

fact that his attempts to become appointed failed.  He also failed to disclose that his

purpose of his efforts were to receive commissions directly from Security Life of

Denver for the sale of the VOYA policy; and thus, he concealed that his efforts in

securing and obtaining the VOYA policy, and replacing the Columbus Life policy, were motivated by self-interest to benefit himself and the interests of Security Life of Denver;

d.      In his capacity as Ryan's investment advisor and financial planner and, with respect to the VOYA policy, as an agent for Security Life of Denver, Salisbury concealed substantial information from Ryan by sending her only signature pages, withholding documents, and providing little to no information about the transactions that he performed on Ryan's behalf, all while maintaining Ryan's trust;

e.      The Salisbury Defendants and Claraphi failed to provide reasonably adequate information about the conflicts of interest that existed among each of them and Ryan, the actual costs associated with the VOYA policy, and failed to provide information about the inherent risks and minimal benefits of the VOYA policy;

f.      When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni also concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with respect to his activities related to Ryan;

g.      When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Diyanni, as Trustee of the

ILIT, concealed the fact that he had failed to perform his fiduciary duties to make a determination of the appropriateness of replacing the Columbus Life policy, or the premium financing arrangement, or the selection and assignment of collateral, and/or the funding of premiums outside of the premium financing arrangement;

h.    Defendant Diyanni drafted an illusory trust designed for his own financial benefit and that of the other Defendants dated March 26, 2016;

i.    Defendant Diyanni charged an excessive fee as indicated on the loan proposal signed by Diyanni on April 12, 2016;

j.    Defendants Diyanni and Salisbury required Ryan to sign an agreement purportedly releasing Diyanni from liability for the legal services he rendered with said agreement being undated but, upon information and belief, was signed around the time of other pertinent documents related to the premium financing arrangement, i.e. on or around March – April 2016;

k.    In his capacity as a writing agent for Security Life of Denver, Bellini knowingly sold the unsuitable and unneeded VOYA life insurance policy to Ryan and improperly replaced her existing policy, which was more appropriate for her financial needs;

l.    When the VOYA policy and premium arrangement were developed and entered into (on or around March – April 2016), Bellini concealed the fact that he was acting with a conflict of interest and was engaging in self-dealing with

respect to his activities related to Ryan as, upon information and belief, he was employed by Aurora Capital and stood to benefit from the transaction at Ryan's expense;

m.     In his capacity as a writing agent for Security Life of Denver, Bellini was required to deliver the VOYA policy to Plaintiff by Security Life of Denver but failed to do so despite knowing that she was a payor on the policy and ultimately responsible for maintaining the loan that would fund the VOYA policy;

n.     In his capacity as the managing partner of Aurora Capital, Defendant Bellini failed to disclose to Plaintiff that she would be required to pay interest annually on the premium finance loan when Plaintiff understood that she would not have to make payments on the VOYA policy and premium finance arrangement;

o.     Defendants Salisbury and Bellini misrepresented Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and failed to disclose that the VOYA policy was a replacement of the Columbus Life policy;

p.     Defendant Security Life of Denver accepting and ratifying Salisbury and Bellini's misrepresentations of Ryan's net worth on the application for the VOYA life insurance policy on or around April 4, 2016 and their failure to disclose that the VOYA policy was a replacement of the Columbus Life policy after being

provided sufficient notice that Plaintiff's signature on the application was procured through fraud;

q.  Security Life of Denver was on notice that Plaintiff was a payor on the VOYA policy, as well as the insured, and that Plaintiff had complained that the VOYA policy was created through fraud, but failed to make any effort to notify her that the VOYA policy was surrendered (even after the notices to Diyanni were returned as undelivered).  Moreover, upon the surrender, Security Life of Denver pocketed $42,025 as a surrender charge and any additional monies being held in reserve for the policy were released and became additional profit for the company;

r.  Security Life of Denver failed to adequately investigate and take appropriate action and failed to rescind the policy and refund the premiums, in response to Plaintiff's complaint to the Hawai'i Insurance Division wherein Plaintiff alleged that the policy was the result of fraud.  Security Life of Denver did not conduct an adequate investigation or rescind the policy because it knew that if the policy was ultimately surrendered (rather than rescinded) the company would profit from the surrender charges and release of reserves;

s.  Defendants Security Life of Denver, Bellini, and Salisbury issued Ryan's VOYA life insurance policy, dated April 5, 2016, with an excessive death benefit that did not correspond to her net worth, her financial needs, and which she could not afford; and

58

t.      Defendant Aurora Capital engaged Defendant Diyanni to draft and serve as Trustee of the Kathy Ryan Irrevocable Trust at an excessive fee of $12,000[8].

117.   Plaintiff was deprived of her property in violation of to CAL. WELF. AND INST. CODE § 15610.30(c) in that she lost her Columbus Life policy, was forced to surrender her Allianz annuity, and lost $37,000 which she felt compelled to transfer to Lake Forest in order to keep the VOYA policy in force that ultimately was surrendered despite her efforts.

118.   Plaintiff is informed and believes and thereupon alleges that, in addition to other damages, Plaintiff is entitled to recover her reasonable attorney fees and costs pursuant to CAL. WELF. AND INST. CODE § 15657.5(a).

119.   Plaintiff is informed and believes and thereupon alleges that in committing these acts, Defendants have acted oppressively, maliciously and fraudulently, with a conscious disregard of the Plaintiff's rights, with the intent of benefiting themselves financially and with the intention of causing, or recklessly disregarding the probability of causing, injury to the Plaintiff. In so acting, Defendants intended to and did vex, annoy, injure and harass the senior Plaintiff.

---

[8] The Kathy Ryan Irrevocable Trust was signed on March 26, 2016 by Diyanni as trustee and Kathy Ryan as grantor.  The loan proposal including the $12,000 fee, which was provided by First Insurance Funding and signed by Michael Diyanni, is dated April 12, 2016.

As a result of such conduct, Plaintiff is entitled to exemplary and punitive damages as well as damages pursuant to CAL. CIV. CODE § 3345.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment as to Security Life of Denver, Alejandro Alberto Bellini, the Salisbury Defendants, Michael Diyanni, and Aurora Capital Alliance)

120.   Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

121.   Despite its knowledge of allegations that the sale of the VOYA policy and replacement of Plaintiff's Columbus Life policy was fraudulently induced, Security Life of Denver refused to rescind the VOYA policy and return the premiums paid.  Instead, it retained some or all of the premiums, which in equity and good conscience belong to Plaintiff.  Although the premiums were paid through a financing arrangement, Plaintiff became responsible for that arrangement by being fraudulently induced to obtain the loan and post the collateral, including her Allianz annuity and the VOYA policy.

122.   As a direct and proximate result, Security Life of Denver has been unjustly enriched by retaining some or all of the premiums paid as well as keeping a portion of the VOYA policy's cash value in the form of a surrender charge.

123.   As part of the premium financing arrangement, the loan provided by First Insurance Funding included a $12,000 fee to Diyanni for serving as Trustee. This amount was excessive, especially in relation to the minimum services

60

provided, and was intended to allow Diyanni to profit at Plaintiff's expense. Although the fee was provided as a part of the loan, Plaintiff bore the financial burden of the loan when the lender surrendered the VOYA policy and Plaintiff's Allianz annuity was surrendered.

124.   As a direct and proximate result, Diyanni has been unjustly enriched by retaining the $12,000, which in equity and good conscience belongs to Plaintiff.

125.   As a part of the sale of the VOYA policy, Bellini received a commission from Security Life of Denver for serving as a writing agent and selling the policy.  Bellini received this commission to Plaintiff's detriment because he sold the VOYA policy to Plaintiff knowing that it was unsuitable for her needs and an inappropriate replacement for her Columbus Life policy.  Bellini also benefitted from the transaction by failing to disclose that he had a conflict of interest as he sought to gain both from the commission of the sale and from the premium financing arrangement in his position as the managing partner of Aurora Capital. As a direct and proximate result, Bellini has been unjustly enriched and Plaintiff suffered damages.

126.   Defendant Aurora Capital arranged for Lake Forest/Wintrust to finance the VOYA premiums and orchestrated the premium finance arrangement at Plaintiff's expense, including by requiring Plaintiff to provide her valuable investments as collateral.  Defendant Aurora Capital profited from this transaction.

As a direct and proximate result, Defendant Aurora Capital has been unjustly enriched, and Plaintiff suffered damages.

127.   The Salisbury Defendants received commissions and/or other compensation for their involvement in the sale of the VOYA policy and orchestration of the premium finance arrangement, all at Plaintiff's expense.  The Salisbury Defendants knew these transactions would be to Plaintiff's detriment.  As a direct and proximate result, the Salisbury Defendants have been unjustly enriched, and Plaintiff suffered damages.

128.   Plaintiff is informed and believes and thereupon alleges that in committing these acts, Defendants Security Life of Denver, Bellini, Diyanni, Aurora Capital, and the Salisbury Defendants acted oppressively, maliciously and fraudulently, with a conscious disregard of the Plaintiff's rights.  These Defendants intended to benefit themselves financially and with the intention of causing, or recklessly disregarding the probability of causing, injury to Plaintiff.  In so acting, Defendants intended to and did vex, annoy, injury, and harass Plaintiff.  As a result of such conduct, Plaintiff is entitled to exemplary and punitive damages.

## FIFTH CAUSE OF ACTION
### (Fraudulent Suppression as to the Salisbury Defendants and Claraphi)

129.   Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

130.    As Ryan's financial advisor, Defendant Salisbury, C. Salisbury, LLC, and Claraphi were under a duty to disclose certain material facts to Ryan regarding the financial transactions performed on Ryan's behalf.

131.    While serving as Ryan's investment advisor and financial planner, the Salisbury Defendants and Claraphi suppressed the truth and failed to disclose pertinent and material facts, including but not limited to:

a.     the substantial commissions the Salisbury Defendants and Claraphi earned from churning Ryan's annuities;

b.     the risks associated with churning annuities;

c.     that Ryan was victim of a churning scheme;

d.     the conflicts of interest existing between the seller of the annuities (the Salisbury Defendants and Claraphi) and the purchaser (Ryan), i.e. that the primary purpose for recommending the annuities in question was to generate commissions and profits for the Salisbury Defendants and Claraphi and that the conflicts of interests were detrimental to Ryan;

e.     the unsuitability of the VOYA policy for Ryan's financial needs;

f.     the unsuitability of replacing the Columbus Life policy;

g.     the risks associated with the funding arrangement of the VOYA policy;

h.      that neither the VOYA policy nor the annuities were superior to other current and/or available investment options;

i.      that neither the VOYA policy nor the annuities were as represented;

j.      that the VOYA policy and the annuities were flawed in design and/or were not being properly managed for the benefit of Ryan; and

k.      that the features and controls of the funding arrangement associated with the VOYA policy and the annuities were being manipulated to the detriment of the Ryan.

132.   Ryan did not know the truth and did not have the material facts necessary to make an informed decision regarding the financial transactions for which the Salisbury Defendants and Claraphi brokered on Ryan's behalf.

133.   Had Ryan known the truth, she would not have acted to her detriment by surrendering several of her annuities at high surrender charges in exchange for other annuities nor would she have purchased a life insurance policy greatly exceeding her needs and financial ability to pay.  Ryan has suffered considerable losses.

134.   The Salisbury Defendants and Claraphi's aforementioned suppression was intentional, and if not intentional, the Salisbury Defendants and Claraphi recklessly suppressed the truth.

135.   The Salisbury Defendants and Claraphi intended to cause damage to Ryan and to conceal their wrongdoing from her by fraudulently suppressing material facts from her.  The Salisbury Defendants and Claraphi's conduct was therefore malicious, and the Salisbury Defendants and Claraphi are also guilty of oppression in that their systematic acts of fraud subjected Ryan to cruel and unjust hardship in conscious disregard of her rights.  Ryan is therefore entitled to punitive or exemplary damages.  As a direct and proximate result of the Salisbury Defendants and Claraphi's conduct, Ryan has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Fraudulent Misrepresentation as to the Salisbury Defendants Diyanni, and Claraphi)

136.   Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

137.   The Salisbury Defendants and Claraphi, while serving as Ryan's investment advisor, and Diyanni, while acting as Trustee of the ILIT, misrepresented pertinent and material facts, including but not limited to the following misrepresentations made around the time that the VOYA policy and premium financing agreement were developed and entered into, i.e. in or around March – April 2016:

a.      representing to Ryan that she would never have to personally pay any premiums with respect to the VOYA policy and that the policy would be funded through the premium financing arrangement and would ultimately fund itself;

b.      representing to Ryan that the VOYA policy would be adequately and completely funded in seven years and her Allianz annuity would then be released as collateral;

c.      representing to Ryan that she needed the VOYA policy for her family to pay taxes after she died;

d.      representing to Ryan that the VOYA policy was suitable for her financial needs; and

e.      representing that the premium financing arrangement was suitable for Ryan.

138.   The Salisbury Defendants and Claraphi, while serving as Ryan's investment advisor, also misrepresented that the high surrender charges associated with Plaintiff's surrendered annuities outlined above in Paragraphs 28–35 would be offset by the newer annuities.

139.   These representations were false, and the Salisbury Defendants, Claraphi, and Diyanni knew these representations were false.

140.   The Salisbury Defendants, Claraphi, and Diyanni intended to deceive Ryan so they could financially benefit from the transactions described herein. The

Salisbury Defendants and Claraphi intended for Ryan to act upon the misrepresentations and false information given by them so that Ryan would surrender her annuities for newer annuities that provided the Salisbury Defendants and Claraphi with substantial commissions.  The Salisbury Defendants, Claraphi, and Diyanni also intended for Ryan to act upon the misrepresentations and false information given by them to induce Ryan to enter into the ILIT and premium financing arrangement to purchase the VOYA policy for their own personal gain.

141.   The Salisbury Defendants, Claraphi, and Diyanni's wrongful conduct proximately caused injury to Ryan in that she detrimentally relied on these misrepresentations and incurred substantial financial losses.

142.   The Salisbury Defendants, Claraphi, and Diyanni intended to cause damage to Ryan by fraudulently misrepresenting material facts to her.  The Salisbury Defendants, Claraphi, and Diyanni's conduct was therefore malicious, and the Salisbury Defendants, Claraphi, and Diyanni are also guilty of oppression in that their systematic acts of fraud subjected Ryan to cruel and unjust hardship in conscious disregard of her rights.  Ryan is therefore entitled to punitive or exemplary damages.  As a direct and proximate result of the Salisbury Defendants, Claraphi, and Diyanni's conduct, Ryan has been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as to the Salisbury Defendants, Claraphi, and Diyanni)

143.   Plaintiff adopts, re-alleges and incorporates herein each and every allegation in the preceding paragraphs, as though fully set forth herein.

144.   Ryan trusted and relied upon the Salisbury Defendants and Claraphi to advise her in making and managing her investments, protecting her assets and/or entering into insurance transactions.  As fiduciaries, the Salisbury Defendants and Claraphi owed to Ryan duties including: (1) to recommend investments only after becoming sufficiently informed as to their nature, price, and financial prognosis, (2) to inform Ryan of the risks involved in purchasing particular securities, (3) to refrain from self-dealing, (4) to not misrepresent any material fact, (5) to adequately and forthrightly explain the potential risks of the investments, and (6) to act in Ryan's best interests.

145.   Documents provided to Ryan, including a Claraphi Advisory Network, LLC Brochure dated March 15, 2018, identify duties and responsibilities of Salisbury's employer, Claraphi (and those who control and/or act on behalf of Claraphi), which have been breached by the Salisbury Defendants including but not limited to:

a.   The Salisbury Defendants were required to send statements monthly if there was activity in the account, and if not, to send statements quarterly.  *See*

Claraphi Advisory Network, LLC Brochure (March 15, 2018) at p. 27, attached as Exhibit "B".  Ryan often did not receive any documentation from the Salisbury Defendants or Claraphi regarding her account.

b.    The Claraphi brochure provided to Ryan represented that the company did not receive sales commissions or special compensation for its services or recommendations.  *See id.* at p. 4.  As set out herein, this is untrue as the Salisbury Defendants and Claraphi received commissions from the annuity churning scheme.

c.    The Claraphi brochure represented that Claraphi generally does not permit front-end or back-end load variable annuities to be purchased in its advisory program, or any other class of annuities with high trail fees.  *See id.* at p. 12.  These types of annuities may only be transferred into a Claraphi account if certain requirements are met.  Yet, Claraphi permitted the Salisbury Defendants to sell several of these types of annuities, which were surrendered at a high cost, to Ryan.

d.    The Claraphi brochure represented that Claraphi adopted a Code of Ethics for all supervised persons of its firm "describing its high standard of business conduct, and fiduciary duty to its clients."  *Id.* at p. 21.  Upon information and belief, the Salisbury Defendants are in breach of this Code of Ethics.

e.    Acknowledging that Claraphi "may receive benefits from relationships with recommended custodians and their affiliates," Claraphi still must, "[a]s part of its fiduciary duty to clients, . . . put the interests of its clients

69

first." *Id*. at p. 23.  As set out herein, the Salisbury Defendants greatly failed in this respect to put the interests of Ryan above their own.

146.   The Salisbury Defendants acted as Ryan's financial planner and investment advisor, as well as estate planning specialist and therefore assumed fiduciary duties to act on behalf of and in Ryan's best interests.  The Salisbury Defendants and Claraphi owed Ryan the duties of loyalty, honesty, fidelity, trust, and due care in their fiduciary obligations.

147.   The Salisbury Defendants and Claraphi violated their fiduciary duties in multiple ways and at different times by, *inter alia*:

a.     unreasonably and in bad faith, refusing to give sufficient consideration to Ryan's welfare rather than their own financial interests;

b.     churning Ryan's annuities;

c.     failing to fully disclose the true characteristics of the annuities sold to Ryan, including the consequences of surrendering Ryan's annuities;

d.     failing to fully disclose the true characteristics and nature of the premium finance arrangement and the VOYA policy to Ryan;

e.     misrepresenting Ryan's net worth on the application for the VOYA policy;

f.      providing Ryan with incomplete information on financial transactions, including failing to provide Ryan with complete documentation on said transactions; and

g.      requiring Ryan to sign but not date incomplete applications for financial transactions and notarizing said documents outside of Ryan's presence.

148.    Defendant Diyanni violated his fiduciary duty in multiple ways and at different times by, *inter alia*:

a.      failing to perform his fiduciary duties to make an appropriate determination of the appropriateness of replacing the Columbus Life policy;

b.      failing to determine the suitability of the VOYA life insurance policy;

c.      failing to determine the suitability of the premium financing arrangement and/or to negotiate more favorable terms;

d.      putting Ryan's funds and collateral at unnecessary risk;

e.      acting with and concealing a conflict of interest;

f.      engaging in self-dealing with respect to his activities related to the Ryan; and/or

g.      charging an excessive fee and/or by failing to render adequate services commensurate with the fee charged.

149.    As described herein, the Salisbury Defendants, Claraphi and Diyanni recklessly or knowingly breached their fiduciary duties by orchestrating, devising,

carrying out, participating in, and/or failing to prevent, terminate, or timely correct the wrongdoing alleged herein.

150.   Each of these violations was achieved because the Salisbury Defendants, Claraphi and Diyanni willingly, knowingly, and/or with recklessness sought to gain their own financial advantage to the disadvantage of Ryan.

151.   As a direct and proximate result of the Salisbury Defendants, Claraphi, and Diyanni's violations of their fiduciary duties, Ryan has been injured, and suffered and continues to suffer economic and non-economic losses, all in an amount to be determined at trial.

152.   In addition, the wrongful acts of the Salisbury Defendants, Claraphi, and Diyanni were done maliciously, oppressively, and with the intent to mislead and defraud.  Ryan is therefore entitled to punitive or exemplary damages.  As a direct and proximate result of the Salisbury Defendants, Claraphi, and Diyanni's conduct, Ryan has been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Violations of the Hawai'i Securities Act as to the Salisbury Defendants and Claraphi)

153.   Plaintiff adopts, re-alleges and incorporates herein the allegations in the preceding paragraphs, as though fully set forth herein.

154.   As described, the Salisbury Defendants and Claraphi advised Ryan to forego suitable investments in securities, and to instead surrender various annuities

at high surrender charges for other annuities bearing similar surrender charges, including those annuities outlined in Paragraphs 28–35.  The Salisbury Defendants and Claraphi also advised Ryan to forego suitable investments in securities for the VOYA policy and to enter into the premium financing arrangement.  The Salisbury Defendants and Claraphi also received, directly or indirectly, consideration from Ryan for providing investment advice.  The Salisbury Defendants violated the Hawaiʻi Securities Act (HAW. REV. STAT. §§ 485A-502, 485A-509) by employing a device, scheme, or artifice to defraud Ryan and by engaging in a course of business which operated as a fraud or deceit on Ryan.

155.   The Salisbury Defendants and Claraphi further violated HAW. REV. STAT. § 485-25(a)(2) by making untrue statements of material fact and omitting material facts, which made their statements misleading.  In connection with providing investment advice to Ryan, the Salisbury Defendants and Claraphi represented that the recommended investments and investment strategies were suitable for Ryan's financial needs and that any high surrender charges associated with the surrender of Ryan's existing annuities would be offset by the performance of other investments without disclosing the risks associated with these investments or strategies.

156.   Ryan demands judgment against the Salisbury Defendants for all losses incurred, all amounts paid as consideration for investment advice, interest,

costs, and attorney fees, as well as any such other further relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests relief as follows:

a.      compensatory damages in an amount to be proven at trial;

b.      statutory, treble, and/or punitive damages as to Counts for which they are available under the applicable law in such amount as the Court deems just and proper;

c.      pre-and post-judgment interest at the maximum rate allowed by law;

d.      attorney's fees;

e.      costs of litigation;

f.      disgorgement;

g.      restitution; and/or

h.      such other legal and equitable relief as the Court deems proper.

DATED: Honolulu, Hawai'i, November 15, 2019.

*/s/ Rex Y. Fujichaku*
MARGERY S. BRONSTER
REX Y. FUJICHAKU
MATTHEW J. TERRY
ROBERT G. METHVIN, JR. (*pro hac vice*)
P. MICHAEL YANCEY (*pro hac vice*)
COURTNEY C. GIPSON (*pro hac vice*)

Attorneys for Plaintiff
KATHY RYAN INDIVIDUALLY AND
IN HER CAPACITY AS TRUSTEE OF
THE BRODY FAMILY TRUST